**Gladys Marie WHITTEMORE,**
**Plaintiff–Appellee,**

**and**

**Walter D. Whittemore, Plaintiff,**

**v.**

**Kenneth L. CLASSEN, M.D.,**
**Defendant–Appellant,**

**and**

**Nashville Memorial Hospital, Inc., Hill Radiology Associates, P.C., and C.Y. Ryu, M.D., Defendants.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Jan. 16, 1991.

Application for Permission to Appeal Denied by Supreme Court April 8, 1991.

Randall L. Kinnard, Nashville, for plaintiff-appellee.

W.W. McNeilly, Jr., Watkins, McGugin, McNeilly & Rowan, Nashville, for defendant-appellant.

## OPINION

TODD, Presiding Judge.

The defendant, Kenneth L. Classen, M.D., has appealed from a judgment against him and in favor of the plaintiff, Gladys Marie Whittemore for malpractice. A jury verdict of $650,000 was reduced by the Trial Judge to $350,000.

### The Case

Gladys Marie Whittemore and her husband, Walter D. Whittemore, sued Nashville Memorial Hospital, Inc., Kenneth Classen, M.D., Hill Radiology Associates, P.C. and C.Y. Ryu, M.D. Mrs. Whittemore sued for $300,000 and Mr. Whittemore sued for $50,000 upon facts briefly summarized as follows.

Mrs. Whittemore entered the hospital for surgical removal of a lesion from her breast. In order to guide the surgeon, Radiology Associates inserted into her breast a wire or needle which was misplaced. The surgery was performed, but the needle was not found and removed during the surgery. Thereafter, a second surgical procedure was performed to remove the needle from the chest cavity. The defendant Classen was the surgeon and the defendant Ryu was the employee of Radiology Associates who inserted the needle.

The hospital answered denying negligence. Dr. Classen answered denying negligence. Dr. Ryu and Hill Radiology answered denying negligence.

The hospital was dismissed by summary judgment.

The cases against the remaining defendants, Classen, Hill Radiology Associates, P.C. and Ryu went to trial before a jury; but, during the trial, Hill Radiology Associates, P.C. and Ryu were dismissed by oral announcement of counsel for plaintiffs. The record contains no order of dismissal, which is the better practice, although T.R.

C.P. Rule 41.01 does not appear to require it.

Thereafter, the trial continued as to Dr. Classen and the jury reported a verdict in favor of Mrs. Whittemore and against Dr. Classen for $650,000. No verdict was reported as to Mr. Whittemore. The Trial Court entered judgment in favor of Mrs. Whittemore and against Dr. Classen for $650,000 and dismissed the suit of Mr. Whittemore.

On suggestion of the Trial Court, Mrs. Whittemore filed a remittitur reducing the judgment in her favor from $650,000 to $350,000, and judgment was entered accordingly.

The Trial Court overruled motions of Dr. Classen to alter or amend and for judgment NOV, and this appeal ensued.

### The Issues

Appellant presents nine issues for review on appeal, of which the first asserts that there is no evidence that the needle was in Mrs. Whittemore's breast prior to the first surgery.

It is undisputed that two needles were inserted in the breast by Dr. Ryu; that the first needle was found to be misplaced and the second needle was correctly placed; that both needles originally protruded through the skin of the breast and neither originally protruded into the chest cavity; that, prior to the first surgery, Dr. Classen discussed the needles with Dr. Ryu and was aware of their presence and position in the breast; that Dr. Classen intended and expected to remove both needles during the first surgery; that, upon arrival of Mrs. Whittemore in surgery, the second, correctly placed needle was in place, protruding from the breast, but the first, misplaced needle was not visible; that the puncture marking the entry of the first needle was visible, and Dr. Classen expected to find and remove it during the surgery; that he proceed with the surgery, completed the desired removal of the lesion, removed second needle, but was unable to find the first needle and completed the surgical procedure.

It is likewise undisputed that, after completion of the first surgery, by further diagnostic procedure (a "CAT Scan") the first needle was found at least partially within the chest cavity; and that, by subsequent thoracic (chest) surgery, the first, errant needle was removed.

■ Appellant's first issue is based upon the lack of evidence that when Dr. Classen began the first surgery, the errant needle was still in the breast where it belonged, and not in the chest cavity where it was later found and removed. The importance of this fact is that, if the needle was in the breast during the surgery, it might be reasonable to infer that Dr. Classen should have found it during the breast surgery and removed it, thereby rendering unnecessary the subsequent, more serious thoracic surgery to remove it from the chest cavity. If, however, at the time Dr. Classen started the first surgery, the needle was already within the chest cavity, then Dr. Classen could not be expected to find and remove it during breast surgery.

Appellant insists that reasonable minds would conclude that the needle was in the chest before Dr. Classen began the breast surgery, based upon uncontroverted evidence that:

1. Dr. Classen opined that the needle was in the chest before the breast surgery because Mrs. Whittemore had complained of chest pains for several hours before surgery.

2. When originally inserted in the breast, four centimeters (about 1¹¹/₁₆ inches) of the needle was left protruding through the skin of the breast.

3. Dr. Classen noticed the needle was no longer exposed outside the breast before he prepared for surgery.

4. Dr. Ryu testified that, when originally inserted, the point of the needle was one to two centimeters outside the chest wall.

In contradiction of the circumstances just stated, Dr. Daniel Starnes testified that the hospital record contained no evidence of complaints of chest pain by Mrs. Whittemore, and that the absence of pain was an indication that the needle was not inside the chest.

Aside from the lack of hospital record evidence of pain, the undisputed testimony is that Mrs. Whittemore did complain of chest pain from the time she left radiology (where the needle was inserted) until she was taken to surgery (about two hours).

Conceding that the circumstances just reviewed weigh heavily in favor of Dr. Classen's theory, this Court cannot say it is such as to merit a directed verdict.

An inference drawn from proven facts is not conclusive on the jury unless it is irrefutable, since another inference drawn from the same facts may be the true one, and it is for the jury to say which is the true inference. *Tennessee–Jellico Coal Co. v. Young,* 18 Tenn.App. 537, 79 S.W.2d 815 (1935).

Appellant next insists that there is no evidence that Dr. Classen failed to exercise the standard of care due Mrs. Whittemore.

T.C.A. § 29–26–115 provides in pertinent part as follows:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

It is seen that the foundation of any medical malpractice suit is (1) evidence of "the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices"; (2) evidence that the defendant acted with less than or failed to act within ordinary and reasonable care in accordance

with such standard; and (3) evidence of proximate resulting injury.

It is remarkable that neither the testimony nor the briefs accurately and completely states the statutory standard of care which is controlling in this case. There are references to "recognized standard of care", or "standard of care", or "standard of care exercised by surgeons", or "standard practice", or "applicable standard of care", "standard of appropriate practice", all of which reflect upon the statutory standard, but do not state it.

It is recommended that counsel and the courts adopt the verbatim verbiage of the statute in all appropriate circumstances and refrain from inaccurate rephrasing.

It is doubtful that the references to professional standards sufficiently conform to the demands of the quoted statute. However, this Court is unwilling at this time to reverse a jury verdict on so tenuous a ground.

█ Appellant's third complaint is the refusal of the Trial Court to admit impeaching evidence concerning the defendant, Dr. Ryu, part of whose deposition was read by plaintiff as that of an adversary party and who was examined during the trial by plaintiff "under the adverse witness rule". The deposition and testimony were presented at a time when Dr. Ryu was a defendant. However, immediately following his testimony, he was dismissed on plaintiffs' motion. Appellant insists that, prior to the testimony, there was an "understanding" between Dr. Ryu and plaintiffs concerning a $50,000 settlement and dismissal. The record shows that, immediately following the testimony of Dr. Ryu, counsel for plaintiff announced:

MR. KINNARD: Your Honor, the plaintiffs at this time voluntarily dismiss Dr. Ryu from this lawsuit and also Hill Radiology Associates.

Subsequently, during the cross examination of Mr. Whittemore, the following occurred:

Q. I will ask you, Mr. Whittemore, prior to starting this trial yesterday, if you did not have an agreement with Dr. Ryu and his counsel, a settlement proposition,—

MR. KINNARD: And, Your Honor, I object to that question, because it calls for a legal conclusion. What that is—I object to that.

A. The only thing I can tell you, we have turned over the—all those proceedings to the attorney, and he's handling all that. If there's—I would hope, you know. But what I'm saying is any of the details or anything like that, I really don't know.

Q. Mr. Whittemore,—

THE COURT: Isn't that confidential?

MR. McNEILLY: No, if it please Your Honor, it's not confidential. But from what Randy says to Your Honor, I have been—I was advised, I am not bringing out anything, I was advised of a settlement of $50,000. And whether he has it in his pocket or not, that there is a firm deal, and that's what the settlement was, and I'm sure Mr. Whittemore knows that.

THE COURT: No, I don't think you have a right to bring that out to the jury. No, sir.

MR. McNEILLY: Leaving the $50,000 out, is it Your Honor's ruling that this jury could get this case with the posture thinking that Dr. Ryu's testimony yesterday—that there was no agreement working between these parties....

\* \* \* \* \* \*

THE COURT: No, I don't agree with you. I don't agree with you. I think that what goes on—that's not for the jury.

MR. McNEILLY: Well, Your Honor, is Your Honor advising us that the Court in this case is not entitled to know if there is a settlement arrangement between the litigants going on in your court as you're conducting a trial? You're telling me, and a defendant, that I'm not entitled to know this during the trial and the triers of the fact are not entitled to know that?

THE COURT: Yes, sir. Yes, sir.

MR. McNEILLY: All right, sir. Then for purposes of a showing of proof, an offer of proof in this case,—

\* \* \* \* \* \*

Q. —you realize there has been a settlement with Dr. Ryu for $50,000, do you not, sir?

A. I'll repeat it back to. I don't know exactly—I haven't talked to Dr. Ryu.

Q. If not Dr. Ryu, what is your understanding of the consideration of the settlement, sir?

A. Well, I understand that there could be a settlement.

Q. How much?

A. I think the figure was about $50,-000.

Q. Yes, sir. And you were aware of that before we started trial yesterday, were you not?

A. I think I was, yes.

There is no evidence that a settlement was consummated between plaintiffs and Dr. Ryu before he testified (adversely to Dr. Classen). However, the circumstances of the pending settlement which was activated immediately at the close of Dr. Ryu's testimony should have been made known to the jury to enable them to properly weigh the expert testimony of Dr. Ryu against contrary testimony of Dr. Classen. This is especially true because Dr. Ryu undertook to place professional blame upon Dr. Classen, a surgeon, when Dr. Ryu is not a surgeon, but a radiologist.

Although there is no evidence that a settlement had actually been finalized at the time of Dr. Ryu's testimony, and the "Mary Carter Rule" is not strictly applicable, any relationship of a party to a witness which might influence the testimony of the witness is a proper subject of impeaching evidence.

The rule of admissibility of evidence to show bias or interest of a witness encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only. *Majestic v.*

*Louisville & N.R. Co.,* 147 F.2d 621 (6th Cir.1945).

■ Appellant next complains that plaintiff was permitted to examine Dr. Ryu as an adverse witness in regard to the negligence of Dr. Classen, as to which he was not a competent witness.

Without objection, plaintiffs' counsel read excerpts from the deposition of Dr. Ryu. T.R.C.P. Rule 32.01 permits the use of a deposition of a party "by an adverse party". It is clear that plaintiffs had a right to use the deposition of Dr. Ryu "against him", that is, to establish his liability. There is some doubt as to the right of plaintiff to use the deposition of Dr. Ryu for the purpose of establishing liability of his co-defendant, Dr. Classen. However, as stated, no objection was made to the reading from the deposition.

After reading from the deposition, plaintiffs called Dr. Ryu to the stand "under the adverse witness rule". The Trial Judge responded, "All right. Come around please, sir." Plaintiffs' counsel asked Dr. Ryu some ninety-seven questions all of which were favorable to Dr. Ryu, ninety-two of which were leading and received an affirmative answer. At this point, counsel for appellant initiated the following exchange:

MR. McNEILLY: If it please Your Honor, at this time—I realize that he has this witness under the adverse witness rule. But insofar as he is questioning or leading the witness for testimony as to Dr. Classen, I object to his leading, for what he's trying to bring out, and I think he should ask direct questions.

MR. KINNARD: I never heard of that, Your Honor. I'm not saying it's not right. I have just never heard of that particular point he's saying. I believe that under the adverse witness rule—

THE COURT: You have to lead them. I think so, too.

MR. McNEILLY: All right, sir. I would like to take something up out of the presence of the jury, if it please Your Honor.

\* \* \* \* \* \*

[Mr. McNeilly] As we come into court today, the pleadings as they stand, the plaintiffs' complaint has been against Dr. Ryu with contentions always that he had put this wire in, that Dr. Classen had delayed taking the wire out. Now, from the nature of the testimony of Dr. Ryu, contrary to being an adversary witness, Mr. Kinnard is making him a witness against Dr. Classen, only as his own witness.

I feel that, as an officer of the Court, that it should be brought out to the Court and the jury, I think there has been a settlement reached between the plaintiff and this defendant, and the Court and these jurors are being led to believe that this is an adversarial procedure when, in fact, it is not. I feel that Dr. Ryu is not a hostile witness, and is being used by Mr. Kinnard to testify only as to the defendant Dr. Classen....

\* \* \* \* \* \*

THE COURT: Let me hear from Ms. Schaffner?

MS. SCHAFFNER: What would Your Honor like to hear from me about?

\* \* \* \* \* \*

MS. SCHAFFNER: I don't have anything, Your Honor.

THE COURT: Well, I respectfully overrule.

MR. McNEILLY: If it please Your Honor, before you overrule the motion, is it my understanding—if Your Honor has correctly stated the adverse witness rule, you put a defendant on and you ask questions which are detrimental to the position of that defendant. Mr. Kinnard is not asking those questions. To the contrary, if you say he's a hostile witness. He's saying, "You've done this carefully, you've done this carefully." All of this is directed as a witness as to Dr. Classen.

I repeat the statement, if it please Your Honor, if you're interested or not, if there has been a settlement reached and this Court—as you have indicated, you know nothing about it, this jury is led to believe this is an adversarial proceeding, or there has been a settlement

reached, then it should be brought to their attention at this time, because otherwise I feel we are talking about a fraud on the Court.

THE COURT: Well, I respectfully overrule your motion.

Thereafter plaintiffs' counsel conducted the following examination of Dr. Ryu:

Q. Okay. So let's go back a minute to the last contact you had before that. The last contact before that was the conversation with Dr. Classen before surgery about the mammograms and the wires; is that right?

A. Yes, sir.

Q. And the next contact is you get the specimen, right?

A. Yes, sir.

Q. So isn't it obvious that between those two contacts you had surgery has been done on Mrs. Whittemore?

A. Yes, sir.

Q. Now, Dr. Ryu, during that period of time between those two times did anybody tell you anything about a wire missing?

A. No, sir.

Q. If you had gotten the word from Dr. Classen in surgery, in the operating room, "I've got a wire missing, Dr. Ryu," would you have ordered or suggested a chest x-ray on that patient?

A. I would have sent portable crew to take a picture of her chest.

Q. And why would you have done that?

A. Try to locate where the missing wire was.

\* \* \* \* \* \*

Q. Why would you have ordered a chest x-ray of Mrs. Whittemore if you had gotten the word, "Hey, there's a wire missing"?

A. When you start doing this—when this type of needle came out, so on, and before we used it we read a couple of articles and—who designed the thing and so forth, and one article that did suggest it, there is a possibility that wire can retract into the breast if there is move-

ment, and a changing of position in a particularly pendulous breast and so on, and that came to my mind and—in that I would have thought about that wire might have indeed retracted under the skin of the breast. Best way to find is with an x-ray, see if that is there.

Q. Could an x-ray—if the wire was in her breast, would an x-ray show that?

A. Yes, sir.

*    *    *    *    *    *

Q. You thought, "The wire's in her breast," didn't you?

A. Yes, sir.

Q. And did you consider that to be the logical place where it would be?

A. Yes, sir.

Q. Did you think that any physician faced with the same question of where is the wire would think logically it's in the breast?

MR. McNEILLY: If it please Your Honor, we object to the relevancy as to what he would think that anyone would do. It's not relevant to the issue.

THE COURT: I will let him answer that.

MR. KINNARD: Go ahead.

A. I guess it depends on which doctor we are talking to.

Q. Well, let's assume it's a doctor who's generally familiar with the wire in, and the fact that it has a hook on it like this, and that it's put in the breast to identify a mark, a lesion, any doctor who is generally familiar with the wire.

A. If doctor is familiar with design of this wire, the purpose of this wire and so on, then should—should think this should be in the patient's body.

Q. Now, what happened next, Dr. Ryu?

A. So I suggested to have a portable x-ray taken while patient is in—Mrs. Whittemore was still in the recovery room. So I urged our technologist to go to take a portable x-ray.

*    *    *    *    *    *

Q. What sort of view was this, Dr. Ryu? I mean, was it sideways, front-to-back or what?

A. We call it anterior-posterior view, but that's easy way of saying it's just front-to-back view. And the patient's lying, in other words covered, x-ray plate on the back in here, x-ray taken from this way. So we are seeing front-to-back view.

*    *    *    *    *    *

Q. But the view from the side wasn't made of her, was it?

A. Not at the recovery room.

*    *    *    *    *    *

Q. Okay. And then was she taken to the x-ray department?

A. Yes, sir.

Q. And these films were made of her?

A. Yes, sir.

*    *    *    *    *    *

Q. And after the films were done, where did the films show the wire really was at that time?

*    *    *    *    *    *

Q. So it had—at the time in the x-ray department you're doing this testing on her, looking at the films, you realized it's not in her breast, now it's behind the chest wall?

A. Yes, sir.

*    *    *    *    *    *

Q. But it's conceivable something bad could happen to that patient with that thing in there?

A. Yes.

Q. And you thought that, didn't you?

A. Yes.

Q. And wouldn't you think any physician that's exercising reasonable care and caution who's familiar with the general principles of that wire should be thinking the same thing?

MR. McNEILLY: If it please Your Honor, we object to the question. He's trying to testify as to any physician.

THE COURT: I respectfully overrule the objection.

Q. Do you agree with that, sir?

A. Yes, sir.

Q. And would you agree that any physician who's observing standard medical practice who is familiar with the general principles of that wire should be thinking "this wire could represent a danger to this woman," sir?

MR. McNEILLY: If it please Your Honor, we object to the question. This witness is not qualified as to a general surgeon. He hasn't qualified him.

MR. KINNARD: Your Honor, I didn't ask him anything about that.

THE COURT: I respectfully overrule his objection.

Q. Go ahead, sir.

A. I think someone who is familiar with this device and also knows that has been moved, yes, I think should be aware of the danger—potential danger of it.

From a reading of the entire direct examination of Dr. Ryu, it is clear that the object of the examination was not to establish liability of Dr. Ryu, but to exonerate him of liability and to fix liability upon Dr. Classen. In the view of this Court, such is not the intent of Rule 41.01. Its true intent is to permit hostile examination of an adversary for the purpose of establishing the liability of *that* adversary and not some other adversary.

In 98 C.J.S. *Witnesses* § 367, p. 114, is found the following text:

> There is authority that the cross-examination of the adverse party is restricted to the issues as to which he is adverse. Thus, an adverse party called as a witness may not be cross-examined with respect to a claim against another party in which the witness is not interested, and where a defendant by his pleading admits plaintiff's allegation that he is an employee of another defendant, he may not be called and cross-examined on that issue as an adverse party.

It was error over objection of Dr. Classen to allow the plaintiff to ask leading questions of Dr. Ryu tending to establish the liability of Dr. Classen.

■ Appellant's next complaint is that the Trial Court admitted testimony of Dr. Daniel Starnes.

After the voluntary dismissal of Dr. Ryu, plaintiffs offered the deposition of Dr. Starnes, a radiologist, at which time, the following occurred:

MR. McNEILLY: If it please Your Honor, we object to this particular deposition because it deals with radiologists. It's a deposition of a radiologist concerning Dr. Ryu, and not under any pretense offered as to the standard of care of a surgeon.

THE COURT: If this is Dr. Starnes' deposition—

MR. KINNARD: This is Dr. Starnes, a witness that was called for evidence last week. He has opinions in this case about the case and what's happened, and I think it's perfectly appropriate that the jury hear it. And he's objecting. I don't know what he's objecting to. He hasn't objected to the admissibility of the tape, you know.

\* \* \* \* \* \*

MR. KINNARD: Yes. Well, he's not testified against the surgeon. He wasn't called for that purpose. But he gives opinions about when the wire went through the chest wall. He's a radiologist, and he talks about a lot of things including his theory on what the wire did, that kind of thing.

THE COURT: Why wouldn't he be permitted to testify?

MR. McNEILLY: If it please Your Honor, this is a deposition that was taken by Dr. Ryu of a radiologist, and his qualifications are as a radiologist, not as a general surgeon, and the witness so says, "I'm not a general surgeon," for purposes that Dr. Ryu conformed to the standard of care as a radiologist in this case.

And it is irrelevant. He is not qualified to testify as to the standard of care of an operating surgeon, and there is no evidence in this case as to a deviation of standard of care of a general surgeon in this case, and this witness can't furnish that supply. And Mr. Kinnard asked some questions that are objected to in this case.

\* \* \* \* \* \*

456

MR. KINNARD: Mr. McNeilly obviously was asking questions of Dr. Ryu that go to the standard of care of Dr. Ryu. He is trying to imply that it's his fault, he stuck the needle in too far, it should only go in two centimeters. His questions said that.

MR. McNEILLY: I have never said anything that it was his fault and he violated the standard of care. And to the contrary, he charged Dr. Ryu with deviating from the standard of care, and that's when I objected earlier in this case. And if it wasn't obvious then what's taken place, I am sure you have figured out what's taken place now.

I never said anything to his standard of care. I asked Dr. Starnes, "Do you consider for the standard of care these are important, these are not?" And now Mr. Kinnard wants to take another radiologist. When he answered my Rule 26 interrogatories in this case, not for over five years,—"Do you have any medical testimony against this doctor?" "No, I don't. The only doctor that I'm going to bring in is Dr. Conway from the University of Virginia to testify against Dr. Ryu."

They went over there, took a discovery deposition of Dr. Conway, but he's not here. Dr. Ryu, in light of that, goes and takes a doctor's deposition to defend Dr. Ryu. He has now dismissed Dr. Ryu from this case, the radiologist.

And now what possible purpose, what possible purpose can a radiologist's testimony—he's not qualified to testify about deviation on the part of a surgeon.

\* \* \* \* \* \*

MR. KINNARD: What he says is that the needle was in the breast at the time of surgery, and there is plenty of proof in this case that, if the doctor-surgeon had done right, he could have gotten that needle out.

\* \* \* \* \* \*

MR. McNEILLY: No. As far as this doctor, this doctor does not testify that there has been a departure from the standard of care. There is nothing in—

in fact, he said, "I can't speak to surgery in this. I'm a radiologist."

\* \* \* \* \* \*

THE COURT: Maybe it would be wise to wait and see if it can be used in rebuttal. I have no idea exactly what anybody's going to testify to. I won't rule right now. But after we hear all the proof, maybe it would be admissible as rebuttal testimony.

\* \* \* \* \* \*

THE COURT: Is that a transcript of the video?

MR. KINNARD: Yes, sir, here it is.

THE COURT: Let me read it overnight and rule in the morning

\* \* \* \* \* \*

MR. McNEILLY: He asked the question again, over on Page 36, and the question is—all of that should not be read to the jury, from Line 16 through 25. And then Randy asked again, and I objected to the form of the question, in that case, "sees that a wire is missing and wants to know where the wire is and wants to inform himself where is the wire, that I do not see outside her breast, before deciding where it was, before making a judgment about where it is, would it be appropriate and standard practice to take a portable chest x-ray?" I believe I object to the form of the question that he has asked the witness, and his answer backs it up, "I'm not sure about standard practice, but it's a reasonable thing to do to find out the location of the wire, yes."

T.C.A. § 29–26–115(b) does not require that evidence as to "recognized standard of acceptable professional practice" come from a physician qualified in the same specialty of medicine as that in which the alleged malpractice occurred. *Searle v. Bryant,* Tenn.1986, 713 S.W.2d 62. However, it is required that the witness testify as to his knowledge of such standard. Qualification in radiology does not necessarily show knowledge of the standards of surgery. This must be shown by evidence, and it was not shown in the case of Dr. Starnes. Moreover, Dr. Starnes was not

asked and did not testify as to the "recognized standard of acceptable professional practice." The burden of his testimony was what would be reasonable, which was not a proper subject of expert testimony under the circumstances.

It was error to admit for the jury's consideration the testimony of Dr. Starnes.

■ Appellant next complains of the refusal of the Trial Judge to instruct the jury as follows:

It is not sufficient that the alleged malpractice was a mere incident in the chain of events. The plaintiff must establish some negligence on the part of the physician and then that the proven negligence was the proximate cause of the injury. Failing that proof, the plaintiff cannot recover. [citations omitted].

In other words, proof of causation in a medical malpractice action cannot rest on conjecture, and the mere possibility of such causation is not enough to sustain the plaintiff's burden of proof.

Equivalent language is not found in the instructions which were delivered to the jury. The requested charge is a correct statement of the law and was peculiarly necessary and appropriate in the present case.

This may be regarded as "the case of the lost needle", or "the case of the wandering needle".

The uncontradicted testimony of Dr. Ryu is to the effect that neither of the needles penetrated the chest wall when inserted and both protruded through the skin of the breast where they were "taped down". Without a speculation that Dr. Ryu falsified, it must be accepted as a fact that neither needle had invaded the chest cavity when the patient left Dr. Ryu's radiology department.

Since one of the needles was later found in the chest cavity, the time when it entered the chest cavity is important. Dr. Ryu testified that such needles were regularly inserted immediately before surgery and that the patient was regularly transported directly from the radiology department to surgery. However, it appears that Mrs. Whittemore was not taken directly to surgery, but was returned to her hospital room where she remained a considerable time before surgery. There is evidence that she complained of pain in her chest during the wait, which was an indication that one of the needles was in her chest cavity causing irritation and pain by the constant movement of the chest, heart and lungs in circulating blood and breathing.

If the needle was in the chest cavity before Mrs. Whittemore was taken to surgery, then the failure of Dr. Classen to remove it during the breast surgery was not actionable because the removal from the chest required an entirely different type of surgery which was later performed.

The evidence is uncontroverted that at the time of arrival in surgery, the needle no longer protruded from the surface of the breast. The evidence is that its point was placed by Dr. Ryu one or two centimeters outside the chest wall and that the other end protruded about four centimeters from the skin of the breast. Although not conclusive, it would appear that the four centimeters movement of the needle required to cause its protruding end to enter the breast would cause the other end to move an equivalent distance of four, or at least two centimeters required for entry into the chest. Of course, variables, such as the angle of placement of the needle would affect the movement required to enter the chest wall, but the preceding reflects upon the probability of various theories of the facts.

It is the insistence of the plaintiffs that, at the time Mrs. Whittemore entered surgery, Dr. Classen erroneously concluded that the needle either had "worked out" and was no longer in the body, or that he would discover it during the surgery. Plaintiffs further theorize that Dr. Classen should have subjected Mrs. Whittemore to a more thorough x-ray diagnosis to discover the true location of the needle before undertaking surgery, and by doing so, would have located the needle in the breast before it entered the chest cavity and thereby would have been able to remove it during the breast surgery.

Thus, according to plaintiffs' theory, the delay of discovery of the needle in the breast would have prevented the migration of the needle into the chest cavity and the resultant second surgery.

There is no direct evidence of when the needle entered the chest, and this fact is critical to the liability of Dr. Classen. The decision as to this critical fact must rest upon circumstantial evidence and a rational course of reasoning by the jury whose verdict must be based on probability and not speculation. The jury may not base a verdict upon "it might have been", but must find that "it probably was". *Perkins v. Parkview Hospital,* Tenn.App.1970, 456 S.W.2d 276; *McPeak v. Vanderbilt Hospital,* 33 Tenn.App. 76, 229 S.W.2d 150 (1950).

In making the fine distinction between possibility and probability, the jury needed all of available legal guidance. This, they did not receive.

It was error for the Trial Judge to refuse to instruct the jury as requested in Dr. Classen's Special Request No. 4.

Appellant's next complaint is that the verdict of the jury is inconsistent.

As stated above, the plaintiffs filed a joint complaint in which Mrs. Whittemore demanded $300,000 damages and Mr. Whittemore demanded $50,000 damages. The transcript records that the Trial Judge stated: "You can either read your pleadings or make an opening statement."

Thereafter, the transcript states: (Whereupon, opening statements were presented to the Court and jury.)

The content of the opening statements is not recorded in the transcript.

The transcript likewise records that closing arguments were presented, but the content thereof is not shown.

From this record it cannot be said that the jury was or was not informed of the amounts sued for.

The recorded charge of the Court contains no reference to the amounts named in the complaint.

The report of the jury is recorded as follows:

THE COURT: What is the verdict of the jury?

THE FOREMAN: We, the jury, find in favor of the plaintiff in this action.

THE COURT: You find for the plaintiff. What sort of award do you make, sir?

THE FOREMAN: We award $650,000.

THE COURT: $650,000?

THE FOREMAN: Yes, sir.

THE COURT: So say you all?

JURORS: Yes, sir.

THE COURT: Anything from counsel?

MR. KINNARD: No, sir. Thank you very much.

THE COURT: Mr. McNeilly?

MR. McNeilly: No, sir.

There is no record that the jury found in favor of either plaintiff in any particular amount, or that this omission was called to the attention of the jury for resolution before their discharge.

■ In a proceeding brought by two plaintiffs, a verdict in favor of "the plaintiff" is too uncertain to warrant a judgment for the principal plaintiff alone. 89 C.J.S. *Trial* § 499, pp. 163, 164; *McClure Grocery Co. v. Watson,* 148 Va. 601, 139 S.E. 288 (1927).

■ The judgment rendered upon the jury verdict reads in pertinent part as follows:

After due deliberation, the jury returned to open Court and announced through its foreman that they found the issues joined in favor of the Plaintiff Gladys Marie Whittemore, against the Defendant Kenneth L. Classen, M.D., and did assess the damages against the Defendant in favor of the Plaintiff Gladys Marie Whittemore, in the sum of Six Hundred Fifty Thousand ($650,-000.00) Dollars.

Accordingly, it is ORDERED, ADJUDGED AND DECREED as follows:

1. That the verdict of the jury is made the judgment of the Court.

2. That the Plaintiff Gladys Marie Whittemore is hereby awarded a judgment against the Defendant Kenneth L. Classen, M.D., in the sum of Six Hundred Fifty Thousand ($650,000.00) Dollars, for the collection of which execution may issue if necessary.

3. That the Plaintiff Walter D. Whittemore have and take nothing of the Defendant Kenneth L. Classen, M.D.

4. That the Court costs in this cause are assessed against the Defendant Kenneth L. Classen, M.D., for which execution may issue if necessary.

Nothing is found in the verdict reported in open court to support a judgment for one of the plaintiffs and a dismissal of the suit of the other.

Moreover, no authority is found for entry of a judgment reciting a verdict not reported by the jury.

The judgment must conform to the verdict of the jury, or it is error. *Patterson v. Butterworth*, 12 Tenn. (4 Yerg.) 158 (1833); *Allen v. Melton*, 20 Tenn.App. 387, 99 S.W.2d 219 (1937); 49 C.J.S. *Judgments* § 56, p. 143.

Upon motion to alter or amend, the plaintiff and the Trial Court undertook to conform the verdict of the jury to the pleadings by remitting the excess of $350,000 and rendering judgment in favor of Mrs. Whittemore for that amount. Even if the verdict had been in favor of Mrs. Whittemore (which it was not), the reduction was ineffective to bring the amount within the amount sued for by Mrs. Whittemore, for it was only $300,000.

In summary, the verdict of the jury was fatally incomplete and both judgments rendered thereon were fatally erroneous.

Since the foregoing mandates a new trial, it is unnecessary to discuss the complaint that the verdict of the jury, even as reduced was excessive, and evinced passion, prejudice and caprice.

The final complaint, that the ultimate judgment of $350,000 exceeds the amount sued for has already been discussed.

*Conclusion*

The judgment of the Trial Court is reversed, the verdict of the jury is set aside and the cause is remanded for a new trial upon the suits of both plaintiffs. Costs of this appeal are taxed against the plaintiffs, jointly.

Reversed and Remanded.

LEWIS and CANTRELL, JJ., concur.