Robert SLATEN, Petitioner,

v.

**EARL CAMPBELL CLINIC HOSPITAL
and Campbell Clinic Association,
Respondents.**

Supreme Court of Tennessee.

April 24, 1978.

Robert J. Shockey, Robert J. Shockey, P. C., Chattanooga, for petitioner.

W. A. Moody, Nashville, Paul Campbell, Jr., Chattanooga, for respondents.

## OPINION

HARBISON, Justice.

Petitioner sustained severe personal injuries while a patient at the respondent hospital.[1] Petitioner jumped or fell from an unguarded window of his third floor room and received spinal injuries resulting in paraplegia. It is insisted on his behalf that he was suffering from severe mental depression and that he jumped from the hospital window in an attempt to commit suicide. At best, however, this is only one permissible inference which might be drawn from the testimony, since there were no eyewitnesses and the petitioner himself has no memory of the occurrence.

---

1. Two separate corporations were named as defendants, but it was stipulated at the trial that the Earl Campbell Clinic Hospital and Campbell Clinic Association were for purposes of this litigation to be considered as one entity. Therefore, in this opinion, we shall refer to that single entity as the hospital, a private institution operated for profit.

■ Joined as a defendant in the trial of the case below was Dr. William C. Dowell, a staff physician of the hospital. At the conclusion of a lengthy trial the jury returned a verdict against the hospital but exonerated Dr. Dowell of all claims of causative negligence which had been asserted against him. Although counsel for petitioner filed a post-trial motion seeking to preserve a right of action against Dr. Dowell, apparently they did not appeal from the action of the trial court in overruling that motion, so that, insofar as we can tell from the record, judgment in favor of Dr. Dowell seems to have become final. If so, it obviously would bar any further proceedings against either Dr. Dowell or against his employer based upon any alleged negligent or improper actions on his part.

The trial judge overruled a motion for new trial filed on behalf of the hospital which alleged, among other things, that the verdict of the jury was inconsistent. On appeal, however, the Court of Appeals sustained that assignment of error and held that, as the case was presented to the jury on the trial record, the verdict was legally inconsistent, the court finding no evidence of any operative or causative negligence on the part of any other hospital personnel than Dr. Dowell. Having held the verdict inconsistent, however, the Court of Appeals went further and dismissed the suit entirely. This Court granted certiorari to give further consideration to the matter.

In our opinion, the analysis of the trial record made by the Court of Appeals is correct, and the verdict was indeed inconsistent in view of the manner and of the theory upon which the case was tried and presented to the jury.

■ It does not necessarily follow, however, that the suit should have been dismissed by the Court of Appeals as a matter of law at this stage of the proceedings. Ordinarily, when there is an inconsistent verdict, the appropriate procedure is to set it aside and order a new trial. This, of course, cannot be done in the present case as to Dr. Dowell, if in fact the judgment in his favor has become final. Such a situa-

tion has been presented in other reported cases, however, and the fact that a complete new trial as to all parties is no longer available has not prevented a new trial as to those parties who appealed and objected to the inconsistent verdict.

Probably the leading case in this state on inconsistent verdicts is *Loveman Co. v. Bayless*, 128 Tenn. 307, 160 S.W. 841 (1913). *See also International Corp. v. Wood*, 8 Tenn.C.C.A. (Higgins) 10 (1918); *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480 (1955).

Decisions subsequent to *Bayless* have developed the rule that when inconsistent verdicts are rendered in master-servant and similar cases, neither the verdict in favor of the employee nor the verdict against the employer can be permitted to stand. *Berry v. Foster*, 199 Tenn. 352, 287 S.W.2d 16 (1955). In the *Berry* case this Court quoted approvingly from *Gray v. Brooklyn Heights Ry.*, 175 N.Y. 448, 450, 67 N.E. 899, 900 (1903) as follows:

" 'When, however, the two actions are thus tried together and inconsistent verdicts are rendered, we incline to the view that sound practice requires both verdicts to be set aside at once, without attempting, by analysis of the evidence or otherwise, to discover whether either should be allowed to stand. No other course is safe, for it cannot be told with reasonable certainty what facts the jury found.' " 199 Tenn. at 356, 67 N.E. at 900.

Again, in *Milliken v. Smith*, 218 Tenn. 665, 405 S.W.2d 475 (1966) this Court stated the rule as follows:

"The obligation of every jury is summarized in the oath taken by its members to render a true verdict according to the law and the evidence. This applies whether the jury is trying one or more cases. And where it plainly appears from the verdicts returned by a jury that it has not fulfilled this obligation, but acting upon considerations other than those presented in the law and the evidence has returned irreconcilably conflicting verdicts, it is the duty of the trial court to order the jury to consider further with

respect to these verdicts, and if it refuses (which we doubt will ever be the case), to order a mistrial, otherwise this Court must reverse." 405 S.W.2d at 477.

See also Southern Ry. v. Butts, 214 Tenn. 328, 379 S.W.2d 794 (1964); Alabama Highway Express, Inc. v. Luster, 51 Tenn.App. 691, 371 S.W.2d 182 (1963).

In both the case of Southern Ry. v. Butts, supra, and in the earlier case of Angel v. McClean, 173 Tenn. 191, 116 S.W.2d 1005 (1938), all of the original parties had not been kept in the case by protective appeals, and judgments in favor of some of them had been permitted to become final. Nevertheless, in each case, the Court found the original verdicts as rendered to have been legally inconsistent and ordered new trials as to the parties remaining in the litigation.

In the case of McInturff v. White et al., Washington Law, released on January 5, 1976, this Court had occasion to deal with the legal effect of inconsistent verdicts, and re-examined many of the cases cited above. Because the problem seems to be a recurring one, we deem it appropriate at this time to direct publication of the opinion in that case, wherein it was pointed out on petition to rehear that when an inconsistent jury verdict is properly challenged, "no judgment whatever could be pronounced thereon."

▆▆▆ We are of the opinion that these cases are controlling here, and that instead of dismissing the suit, the Court of Appeals should have remanded the case for a new trial as to the respondent hospital. The legal effect of the final judgment in favor of Dr. Dowell, and whether or not it will preclude any effective right of action of the petitioner in further proceedings, are not issues presently before the Court and will have to be dealt with upon the remand. As pointed out in the cases cited above, however, an inconsistent verdict is, in legal theory, a nullity and amounts to no verdict at all when properly attacked. Had the petitioner appealed as to Dr. Dowell, the appellate courts could have granted the petitioner a new trial against him as well as granting a new trial in favor of the hospital on its appeal. On the record before us, however, the only appealing party was the hospital. Its complaint of an inconsistent verdict having been sustained, in legal theory there is no verdict at all against it, and as to it the cause should be remanded for a new trial.

The assignment of error of the petitioner to the action of the Court of Appeals in dismissing the suit entirely is sustained, and the cause is remanded to the trial court for further proceedings consistent herewith. All other assignments of error of the petitioner as well as those assignments preserved by the respondent for review here are overruled. Costs accruing in the appellate courts will be taxed equally to the parties; costs in the trial court will be finally adjudged there.

HENRY, C. J., and COOPER and FONES, JJ., concur.

BROCK, J., dissents.

BROCK, Justice, dissenting.

I respectfully dissent because I find that there was no inconsistency in the verdict since the plaintiff alleged and proved that employees of the hospital other than Dr. Dowell were guilty of negligence which directly and proximately caused the plaintiff's injuries.

I

The issue is primarily a factual one of examining the record to ascertain whether it discloses evidence of negligence on the part of employees and agents of the hospital other than Dr. Dowell upon which the verdict of the jury could be based.

It is clear from an examination of the plaintiff's complaint that his assertion of liability against the hospital was not confined to acts of negligence on the part of the codefendant, Dr. William C. Dowell. Indeed, he did not assert anywhere in the complaint that Dr. Dowell was the agent, servant or employee of the hospital. Throughout the complaint, Dr. Dowell and

the hospital are treated as joint tortfeasors. Moreover, in alleging negligence on the part of the hospital, the complaint refers repeatedly to the latter's servants in the plural rather than the singular. To demonstrate this, I quote excerpts from the complaint as follows:

"The defendant, Campbell Clinic Hospital, *their employees and agents,* acknowledged his condition of severe depression and suicidal potential at the time of his admission or shortly thereafter. Notwithstanding this knowledge defendant*s* did absolutely nothing to alleviate his depression, nothing to protect him from self-inflicted harm, and nothing relative to psychiatric consultation or help. Ironically, the defendant*s* advised the plaintiff's family that he didn't need psychiatric help, for reasons known only to *themselves. They* placed the plaintiff in a top floor room of the hospital, and with no protection whatsoever, . . ..

"IV

"Plaintiff avers that the defendant*s, their agents* and employees, were negligent in *their* care and/or lack of care to such plaintiff and failed to meet the standard of care in this area or similar areas for medical and hospital treatment of mentally ill or afflicted patients.

"V

"Plaintiff avers that the defendant*s'* lack of care or protection was tantamount to abandonment of the patient.

"VI

"Plaintiff avers both ex delicto and ex contractu that *they* owed a duty to the plaintiff to give reasonable care and attention for his safety as his mental condition required and to safeguard him against known or reasonably to be appreciated danger to himself due to his mental derangement, and *they* failed therein.

"VII

"Plaintiff further avers that the defendant*s* were negligent in the following respects:

"1. Accepting the plaintiff as a psychiatric patient when *they* were unwilling, unequipped or unqualified to render proper treatment.

"2. Failing to treat, in an appropriate and effective medical manner, the plaintiff's depressive state.

"3. Failing to obtain psychiatric consultation.

"4. Failing to protect *their* patient from self-inflicted harm when *they* knew or should have known that such safeguards were necessary." [Emphasis added.]

Clearly, the plaintiff did not restrict his theory of liability against the hospital to acts of negligence on the part of Dr. Dowell but was relying upon the acts or failure to act of other employees, servants and agents of the hospital who were not sued.

At the time plaintiff received his injuries he was 26 years of age and held a responsible position with an insurance company. He was about to be married and as the wedding day approached he apparently began to feel overwhelmed by the prospect of the solemnities. At the same time he had increased responsibilities and pressures with his work. He experienced insomnia and inability to concentrate, to make simple calculations or to remember names. Finally, on June 30, 1974, having attended a buffet supper in his honor at which he had several drinks, he wrecked his employer's automobile which caused him to become fearful that he would lose his job.

Although the plaintiff was in good spirits during most of the six months period immediately before his planned wedding for July 13, 1974, on July 2, 1974, he broke his engagement and became depressed and apparently disoriented. His brother, John Slaten, having learned of the plaintiff's condition from his sister, decided to go to Nashville and bring Bobby, the plaintiff, home to Chattanooga. John found the plaintiff staring at a wall and unable to carry on a conversation. Moreover, considerable time elapsed upon their meeting before the plaintiff indicated that he recognized his brother. John brought the plaintiff to Chattanooga and during the trip the plaintiff manifested extreme nervousness and feelings of worthlessness. The plaintiff indicated that he had considered suicide.

After their arrival in Chattanooga, John Slaten became so concerned about his brother's health that he decided to hospitalize the plaintiff. Accordingly, John Slaten took the plaintiff to the emergency room of the defendant hospital. Before admission he told the hospital employee there in charge, being either a nurse or Dr. Larry Moorman, a resident physician, that Bobby had been very nervous and depressed, that he had been exhibiting abnormal behavior, that no members of the family were available to watch after Bobby and that he, John, feared that Bobby would attempt suicide.

Dr. Moorman, who was a young resident at another hospital but who also worked part time at the defendant hospital as a resident physician, telephoned Dr. Dowell who was at his residence and off duty and received from him approval to accept the plaintiff as a patient.[1] Someone in the employment of the hospital assigned the plaintiff to a room on the top floor, being the third floor of the hospital, a room which contained an unguarded window looking out over the parking lot of the hospital. The identity of the employee who made this room assignment is not clearly shown in the record, but it is shown that Dr. Dowell did not do so; Dr. Dowell so testified. Plaintiff remained a patient in his room on the third floor of the hospital until he jumped on the morning of July 5.

It was stipulated at the trial that Dr. Moorman was an employee of the defendant hospital and was in charge of the emergency room at the time the plaintiff was admitted.

Dr. Dowell, a specialist in internal medicine, testified that on the night of July 2 he received a telephone call from Dr. Moorman and approved the plaintiff's admission to the hospital. Dr. Dowell denied that he had been informed by Dr. Moorman on the night of July 2 that the plaintiff had indicated a tendency toward suicide. He testified that Dr. Moorman was the one who "evaluated" the plaintiff as a patient and

determined that he should be placed in a room on the third floor of the hospital. He testified that he could not explain why the plaintiff was not placed in a room on the ground floor of the hospital. It is clear from the testimony of Dr. Dowell that he was not the admitting physician but that Dr. Moorman, who consulted with Dr. Dowell, was the admitting physician.

Dr. Dowell explained that he made a brief preliminary examination of the plaintiff on the morning of July 3 and held a more extensive interview later in the day. On these occasions, he did not detect any irrational behavior or loss of contact with reality on the part of the plaintiff. Upon being told that the idea of suicide had occurred to Bobby, Dr. Dowell attempted to explore the subject more thoroughly with the patient but could get no further response. Dr. Dowell arrived at a diagnosis of "secondary situational depression moderately aggravated by recent heavy drinking." He concluded that the patient was not psychotic and saw no necessity for a psychiatric consultation or for confinement in a psychiatric ward. He testified that on July 3 he dictated an admission note for the plaintiff's hospital record in which he stated that the plaintiff "has been severely depressed to the point of attempting suicide." This note of Dr. Dowell, although dictated on July 3, 1974, was not transcribed and did not appear in the patient's hospital record until after the patient had jumped on July 5; such is the testimony of Dr. Nelson as hereinafter set out. Dr. Dowell admitted that it is possible that the reason the plaintiff jumped from his hospital room was his "severe depression," although an illness of this severity was not apparent to Dr. Dowell at the time he examined the patient. He also testified that it is not the policy of the defendant hospital ordinarily to admit severely depressed patients because proper and suitable facilities to care for such patients are not available at that hospital. He also admitted that the defendant hospi-

---

1. It should be noted here that Dr. Moorman was not called as a witness in this case, although it appears that he was available.

tal took no protective measures for protecting the plaintiff from the harm which ensued.

Dr. Merrill Nelson, another physician employed by the defendant hospital, also testified. One of the attorneys representing the defendant hospital indicated in argument that there was some question whether Dr. Nelson was employed by the hospital, but the record clearly shows that he was. Thus, the doctor himself testified:

"Q. Where are you employed Sir?
"A. At Campbell Clinic.

* * * * * *

"Q. When did you go Campbell Clinic?
"A. 1954.
"Q. You have your own private practice and yet with your practice you also have certain duties in the hospital?
"A. Well, I do read our brain type things, neuro-medicine type hospital related things. I read some of the electrocardiograms. I don't have a lot of exactly hospital duties as separated from my private practice except for those.

* * * * * *

"Q. In your function there, Sir, did you ever have any contact or at any time that you acted as a physician for Robert Slaten?
"A. Yes.
"Q. All right. How did that come about Sir?
"A. I don't really need the record. I guess I remember well enough. I may ask for it.
"Q. Yes Sir.
"A. Ok. On the 4th of July last year—we have the customary four days a year of letting two of the three of us guys off. One of the guys takes calls. We have three interns. I believe I was off Christmas—it doesn't matter a whole lot, but I was on the 4th of July. I made rounds on all of the internal medicine patients in the hospital on that date. Mr. Slaten was one of the first. I think I started upon his floor, as a matter of fact."

Dr. Nelson, as a staff physician of the defendant hospital, assumed the task of treating the plaintiff while Dr. Dowell was away from duty on the 4th of July weekend. He first saw the plaintiff on July 4 while making his rounds in the hospital and found the plaintiff to be "obviously depressed" but coherent. Concerning his examination of the plaintiff, he stated:

". . . I did spend extra time with him because I could see that he was bothered."

He testified that the patient did not communicate readily but that he found no evidence of psychosis. He also testified that he had the benefit of Dr. Dowell's "progress notes" but that these did not contain Dr. Dowell's dictated but untranscribed note to the effect that the plaintiff had been depressed to the point of attempting suicide which, he stated, did not appear on the chart until Friday, July 5, the day that the plaintiff jumped.

In response to hypothetical questions, Dr. Nelson gave some rather candid testimony which the record shows made a rather strong impression upon the trial judge. Thus, he testified that a patient with symptoms such as the plaintiff had at the time of admission should not have been placed in a third floor room with free access to windows that could be opened; but that if such a patient were placed in such a room, minimal precaution would require that someone be stationed in the room to watch the patient at all times. He explained that he did not recommend a change of the plaintiff's room because he thought that the plaintiff had improved somewhat and that a change of room might upset him, although he wrote on the plaintiff's chart that the plaintiff was "still deeply depressed . . . still rather withdrawn." He further testified that it is a "well recognized, established medical rule that if you have a severely depressed patient, you must watch out for suicidal tendencies and take appropriate precautions."

The only psychiatrist who testified in this case was Dr. Phillip Sottong of Chattanoo-

ga who was called by the plaintiff. He testified in replying to a hypothetical question, in which he was asked to assume the facts which were known to the staff of the defendant hospital on the night that the plaintiff was admitted as a patient, that the standard of care in the Chattanooga area would dictate that: (1) the defendant hospital, which was without protective facilities, should not have accepted the plaintiff as a patient, (2) if such a patient were accepted by the defendant then "suicide precautions" should be taken, including the keeping of a nurse or member of the family in the room with the patient at all times, denying him access to unguarded windows, (3) that such a patient should not be placed upon the top floor of the hospital as was the plaintiff and (4) that the defendant should have arranged for a psychiatric consultation.

In reply to a hypothetical question assuming as fact the symptoms displayed by the plaintiff in the days just prior to his admission to the defendant hospital, that is, that the patient was suffering from insomnia, obsessive worry about money, unwarranted fear of losing his job, feelings of personal worthlessness, inability to think and speak coherently and who had undergone a dramatic change in his personality and physical behavior, Dr. Sottong testified that it was his medical opinion that the case presented was one of "a rather typical picture of a psychotic depression." He testified that such a patient is dominated by feelings of hopelessness to the extent that his behavior is not subject to rational direction, although such a patient may not display symptoms of depression all of the time so that it is possible for the observer to be deceived.

Dr. Sottong testified that doctors Dowell and Nelson were specialists in internal medicine and that such specialists, among other things, should be skilled diagnosticians who should be able to identify specialized medical problems and make appropriate referrals to other specialists, including psychiatrists. He testified that the fact that a patient had considered suicide would be extremely important to the physician, although the patient might characterize such thoughts as being foolish. He also testified that the fact that the patient behaves normally, eating and sleeping well, as did the plaintiff, would not reduce the physician's concern about him if the symptoms hereinabove stated also had been displayed.

He explained that the fact that the patient may have been correctly diagnosed as suffering from "situational depression" did not exclude the possibility of "psychotic" depression, since "situational" refers to the cause of depression while "psychotic" refers to the intensity or gravity of the illness. He stated too that "moderately severe depression" could be descriptive of a psychotic depression. He stated also that a psychotic depression could develop suddenly, depending upon the patient and the kind of strain to which he was subjected, so as to precipitate a crisis with very little warning. An impending marriage could create such a strain because "[at] the point of marriage, your whole value system is being put on the line. . . ."

## II

Viewing the foregoing evidence most favorably to the plaintiff, as we must, I find ample evidence of negligence on the part of employees of the defendant hospital, other than Dr. Dowell, upon which the verdict of the jury and judgment of the trial court may be sustained.

## A.

First, there is evidence to sustain a conclusion that the defendant hospital was negligent in accepting the plaintiff as a patient under the circumstances existing. The jury could have concluded that the defendant knew that it did not have adequate facilities for treatment of a severely depressed patient. Such an inference is supported by the testimony of Dr. Dowell and the testimony of Dr. Sottong. That the plaintiff was a severely depressed patient is shown by the testimony of Dr. Sottong and by the entries made in the plaintiff's hospital record by doctors Dowell and Nelson, e. g., Dr. Dowell's note that the plaintiff ". . . has been severely depressed to

the point of attempting suicide" and Dr. Nelson's note that plaintiff was ". . . still deeply depressed . . . still rather withdrawn."

Moreover, the evidence supports the conclusion that the young resident physician, Dr. Moorman, who was not called as a witness at the trial, is the employee of the defendant hospital who was primarily responsible for the decision to accept the plaintiff as a patient although he did confer by telephone with Dr. Dowell before the plaintiff was admitted. The jury could well have found Dr. Dowell blameless in the admission of plaintiff to the hospital, in that, Dr. Moorman did not convey to Dr. Dowell the full import of the severity of the plaintiff's illness and the significant history given to him at the emergency room by the plaintiff's brother, John Slaten, who made it clear to Dr. Moorman that the very reason the plaintiff had been brought to the hospital emergency room was that he had been severely depressed to the point of attempting suicide and that the Slaten family had no one available to watch the plaintiff and protect him from his illness. The duty assumed by the hospital was as much to *protect* the plaintiff as it was to *treat* him. Moreover, this duty was one assumed by the hospital, not by Dr. Dowell. The record of admission states that plaintiff was admitted "for observation and medication."

### B.

Secondly, the evidence abundantly supports the conclusion that it was negligence for the plaintiff to be placed in a room on the third floor of the hospital which contained an unguarded window through which the plaintiff jumped three days after his admission and that the decision to place the plaintiff in this room *was not made by Dr. Dowell* but by Dr. Moorman or some other employee of the defendant hospital. Thus, Dr. Dowell testified as follows:

"Q. . . . Doctor, would you place such an individual on the top floor of your hospital with open access to windows, yes or no?

"A. This patient was placed in the hospital?

"Q. Yes or no, would you answer the question yes or no?

"A. Ordinarily not.

"Q. Now, you may explain.

"A. This patient was put in this room at night before I had ever seen the individual. I had never seen the patient the night he was admitted. *He was evaluated by Dr. Larry Moorman who made that determination.*" (Emphasis added)

Every physician who testified in this case was of the opinion that a patient with the plaintiff's symptoms should not have been placed in that third floor room unattended.

### C.

Not only could the jury have concluded that it was negligence to place the plaintiff in that room initially, but it also may well have concluded that it was negligence on the part of Dr. Nelson to fail to have the plaintiff *moved to a safer room* after he examined the plaintiff on July 4 and found him to be "still deeply depressed . . . still rather withdrawn."

### D.

Next, there is adequate evidence in the record to support the conclusion that, once placed in that third floor room, the defendant should have made certain that a nurse or some member of the plaintiff's family was available at all times to watch the plaintiff. Dr. Nelson testified to this effect, as did Dr. Dowell and Dr. Sottong. It is likewise clear from the record that this duty fell upon the hospital rather than Dr. Dowell.

### E.

Finally, there is evidence from which the jury could have concluded that the defendant hospital did not afford to the plaintiff proper medical care, e. g., (1) its failure to arrange for a psychiatric consultation with a specialist, (2) its failure to properly administer the medication, Elavil, which had been prescribed by Dr. Moorman for the

patient and which acts to alleviate depression and anxiety and (3) the failure of hospital employees to communicate vital information from one to the other, such as the failure to transcribe Dr. Dowell's note of July 3 that the plaintiff ". . . has been severely depressed to the point of attempting suicide . . ." until July 5, the day the plaintiff jumped. It is clear that these failures, these omissions, cannot be laid solely at the door of Dr. Dowell who was not present after July 3; these failures were the failures of nurses, Dr. Nelson and other physicians and employees of the hospital. The record shows that the note of Dr. Dowell dictated on July 3 was made specifically for the purpose of alerting Dr. Nelson and others who would be looking after the plaintiff during Dr. Dowell's absence to the "possible suicide tendencies of the patient," and that this cautionary note of Dr. Dowell was not transcribed until too late.

The experienced trial judge gave comprehensive instructions to the jury respecting the relative duties owed by the defendant hospital and by Dr. Dowell to the plaintiff. Pertinent here are the following excerpts from those instructions:

"First of all, with regard to the duties of a hospital, the general rule is that voluntary submission to the authority of a hospital raises an implied obligation on the part of the hospital to give the patient such reasonable care and attention for his safety as his mental and physical condition requires.

"And if he is bereft or deprived of reason and this fact is known by the hospital authorities or in the exercise of ordinary and reasonable care it should be known, the authorities are in duty bound to use reasonable care to prevent an act of violence or injury by or to the patient.

"In other words, the rule is that the attending physician and the hospital are required to exercise such reasonable care towards the patient as his known condition may require and the extent and character of this care depends upon the circumstances of each case.

\*     \*     \*     \*     \*     \*

"Now, as I have stated, this is a suit against the Earl Campbell Clinic Hospital and Dr. William C. Dowell, and the plaintiff's action is based upon negligence. . . . .

"Now, in that regard, Dr. Dowell is an employee of the hospital, and if you find against Dr. Dowell, you would have to find against the hospital. The converse, though, is not true. If you found—you could find, and I am not suggesting anything to you—I am simply outlining possibilities—in the event that you found that Dr. Dowell was not guilty of any negligence or breach of the duties imposed upon a physician but you found that other physicians of the hospital or other employees of the hospital were and you found against the hospital, you might find against the hospital and not against Dr. Dowell.

"But that's entirely up to you as the sole judges of the facts and I am not in any way suggesting anything to you."

From an examination of the complete charge of the court to the jury, I find no fault with it, nor is any asserted by the defendant. *See Thompson v. Methodist Hospital,* 211 Tenn. 650, 367 S.W.2d 134 (1962); *Rural Education Association v. Anderson,* 37 Tenn.App. 209, 261 S.W.2d 151 (1953). It is my conclusion that, consistent with this charge and the evidence above discussed, the jury could with entire consistency find a verdict in favor of the plaintiff and against the hospital and, at the same time, upon the same evidence and under the same charge, find a verdict in favor of Dr. Dowell and against the plaintiff. In short, I conclude that this jury verdict, which was recognized as consistent by the trial judge and approved by him, is responsive to the pleadings, supported by the evidence and consistent with proper jury instructions and, therefore, is not fatally inconsistent, as insisted by the defendant. *Accord, Grewe v. Mount Clemens General Hospital,* 74 Mich.App. 479, 253 N.W.2d 805 (1977).

This is not a case in which the sole basis for liability of the master is the alleged act

of a servant whom the jury has found to be blameless. Here, the plaintiff was placed in the care of the defendant hospital, not of Dr. Dowell, for safekeeping and treatment, or as the admission note recites, "for observation and medication." There simply is no basis for concluding that the duties thus assumed were to be performed solely by Dr. Dowell. They were duties owed by the hospital and were non-delegable. *Rural Education Association v. Anderson, supra.*

In my opinion the Court of Appeals erred in reversing the judgment of the trial court and directing a verdict.

I would reverse the judgment of the Court of Appeals and reinstate that of the trial court.