# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

CONCRETE SPACES, INC.,　)
FAUX FUR, INC.,　)
PAULETTE DALTON, and　)
STUART DALTON,　)
　)
　　Plaintiffs/Appellees,　)
　)
VS.　)
　)
HENRY SENDER, Individually,　)
DARREN LIFF and ZACKARY LIFF,　)
HENRY SENDER, EUGENE I. SACKS　)
and wife RUTH SACKS, d/b/a　)
LIFF, SENDER AND SACKS, Tenants　)
in Common, NATIONAL BUILDING　)
CORPORATION,　)
　)
　　Defendants/Appellants.　)

**FILED**

July 31, 1998

**Cecil W. Crowson
Appellate Court Clerk**

Davidson Chancery
94-993-I

Appeal No.
01A01-9607-CH-00288

APPEAL FROM THE CHANCERY COURT
FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE WHITNEY STEGALL, SPECIAL CHANCELLOR

For Plaintiffs/Appellees:

Steve North
Mark North
Madison, Tennessee

Abby Rubenfeld
Nashville, Tennessee

For Defendants/Appellants:

Charles Hampton White
Andrew D. Dunn
Cornelius & Collins
Nashville, Tennessee

## AFFIRMED IN PART; REVERSED IN PART;
## AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal arises from a dispute over the lease and renovation of commercial space in Nashville's Cummins Station. After abandoning the leases because the renovations had not been completed within the time promised, the lessees filed suit in the Chancery Court for Davidson County against the lessors and the project manager. A jury awarded the lessees $75,000 in compensatory damages and $1,100,000 in punitive damages which the trial court later reduced to $500,000. On this appeal, the lessors and the project manager take issue with the punitive damage award and with the inconsistencies between the judgment and the jury's answers to special interrogatories. We affirm the compensatory damage award; however, we vacate the punitive damage award and remand the case to the trial court to consider whether the compensatory damages should be trebled in accordance with the Tennessee Consumer Protection Act.

## I.

In early 1993, Paulette Dalton operated two businesses on lower Broadway near Second Avenue – a vintage clothing boutique called The Emperor's New Clothes and a gallery for local artists called The Gallery on Broadway. She was considering relocating her businesses because she needed more space and because she had been approached by Gavin Gaskins about combining her gallery and boutique with a nightclub. Mr. Gaskins had managed several nightclubs in Nashville, and he and Ms. Dalton believed that a nightclub featuring progressive "grunge" music could be a commercial success. They became interested in Cummins Station after Ms. Dalton received an advertisement from its leasing agents in July 1993.

Cummins Station is a large, five-story building on the corner of Tenth Avenue, South and Demontbreun Avenue in Nashville. It was erected in 1913 as office and warehouse space for wholesale merchants. It was largely unoccupied when a group of investors led by Henry Sender[1] purchased it in March 1993 with the view to

---

[1]The other four investors were Darren Liff, Zackary Liff, Eugene Sacks, and Ruth Sacks. The investors owned the property as tenants in common and did business under the trade name of
(continued...)

renovate it into office, retail, and warehouse space. The building had fallen into disrepair, and the purchasers understood that it would require extensive renovations in order to make it suitable for commercial tenants.

After discussing the location with her husband,[2] Ms. Dalton met one of Cummins Station's leasing agents to inspect possible spaces for the boutique, gallery, and nightclub. Ms. Dalton then toured Cummins Station a second time accompanied by her husband, Mr. Gaskins, and the curator of her gallery. After deciding that the space met their needs, the Daltons and Mr. Gaskins formed two corporations to carry out their business ventures. The Daltons incorporated Concrete Spaces, Inc. to operate the boutique and art gallery, and Ms. Dalton and Mr. Gaskins incorporated Faux Fur, Inc. to operate the nightclub.

On August 18, 1993, the Daltons and Mr. Gaskins met with Mr. Sender, Michael Cooper, who is Mr. Sender's son-in-law and who is also the president of National Building Corporation[3], and the leasing agents to discuss the lease terms and the improvements needed in order to operate a boutique, art gallery, and nightclub in the proposed space. Mr. Sender left the meeting early, and most of the discussions concerning the parties' obligations with regard to the "build out" of the space were handled by Mr. Cooper. During the meeting, Ms. Dalton stated she desired to open for business in early October in order to take advantage of the peak retail months of the holiday season. Mr. Cooper and the leasing agents replied that the space would be ready for occupancy by the first of October.

At the conclusion of the meeting, the leasing agents provided the Daltons and Mr. Gaskins with copies of two proposed leases – one lease with Concrete Spaces for the boutique and gallery and the other lease with Faux Fur for the nightclub. The Daltons' lawyer proposed extensive alterations in the leases. Eventually, on August

---

[1](...continued)
"Liff, Sender, and Sacks". Mr. Sender owned a 25% interest in the property; Mr. and Mrs. Sacks owned a 25% interest; and Darren and Zackary Liff owned the remaining 50% interest. Darren and Zackary Liff eventually acquired Mr. and Mrs. Sacks's 25% interest in the property.

[2]Stuart Dalton worked as a sales representative for a medical supply company and did not take an active role in the day-to-day management of his wife's businesses.

[3]National Building Corporation was the project manager for the renovation of Cummins Station. Mr. Sender is the chairman and chief executive officer of National Building Corporation and is also a major stockholder of the company.

26, 1993, the parties executed two leases for approximately 6,520 square feet of contiguous space on the first floor of Cummins Station. The terms of the two leases were essentially the same. Their term was for five years, and the rent was $1,222.50 per month. Attached to both leases was an exhibit addressing some of the needed improvements to the space. The Daltons signed the Concrete Spaces lease, and Ms. Dalton and Mr. Gaskins signed the Faux Fur lease.

As it turned out, the two leases did not clearly allocate the parties' responsibilities concerning the build out of the leased space. Ms. Dalton understood that the lessors would be responsible for paying for most of the improvements and for seeing that they were completed in time to open her businesses in October. Messrs. Sender and Cooper believed that this responsibility belonged to the lessees. As a result, the construction of the improvements was delayed, and numerous disputes arose between the parties – particularly between Ms. Dalton and Mr. Sender.

Even though the construction plans for the leased space were not completed until September 28, 1993, the space for the boutique and gallery were ready for their grand opening on October 22, 1993. The insurance company providing coverage for the inventory in the boutique and gallery required Ms. Dalton to inquire into the security and fire safety of the building before she moved her inventory into the new space. Even though a rear door opening onto a common hallway had not been installed, Mr. Cooper assured Ms. Dalton that the building was secure and that the fire sprinkler system was adequate. Relying on Mr. Cooper's assurances, Ms. Dalton moved her inventory into the building, and the boutique and gallery opened for business on October 22, 1993.

The boutique and gallery were burglarized on October 24 and again on October 27, 1993. The thieves stole all of Ms. Dalton's inventory, a safe containing approximately $2,350 in cash and other business documents, a stereo system, and a cash register. When Ms. Dalton suggested that the lessors should reimburse her for the loss because Mr. Cooper had assured her that the building was secure, Mr. Sender and one of his business associates declined to accept responsibility for the burglary. They pointed out that the leases provided that each lessee was responsible for the security of their space.

Following the second burglary, the electrical contractor submitted a draw request to Ms. Dalton for $7,500 of the approximately $32,000 in electrical work that had been performed in the leased space. Ms. Dalton and Mr. Gaskins insisted that the lessors were responsible for the electrical work. On November 8, 1993, Mr. Gaskins, on behalf of Faux Fur, wrote a letter to Mr. Sender complaining about the delay in completing the improvements for the nightclub and the "exorbitant bill for proposed electrical work." Mr. Gaskins also stated that he was terminating Faux Fur's lease because of the lessors' breaches. Mr. Sender responded on November 12, 1993 by informing Mr. Gaskins that the lessors intended to hold Faux Fur fully responsible for its obligations under the lease.

Ms. Dalton never reopened the boutique and gallery following the burglaries but continued with her efforts to open the nightclub. The planned October 29, 1993 opening date was rescheduled to January 28, 1994 because the construction of the improvements had not been completed. The relationship between Ms. Dalton and Mr. Sender continued to deteriorate because of the construction delays, their dispute over the burglary, and their disagreement over paying for the electrical work. One of their last confrontations occurred when Mr. Sender told Ms. Dalton that he would not permit her to operate a gay bar in Cummins Station. Mr. Sender eventually declined to meet with Ms. Dalton, and Mr. Dalton was forced to take time away from his job to assist his wife with the project.

In early January 1994, Ms. Dalton applied for a beer permit and a dance permit in anticipation of the nightclub's January 28, 1994 opening. She was unable to obtain these permits because the lessors could not provide her with a final use and occupancy permit and a certificate from the fire marshal. Accordingly, Ms. Dalton could not sell alcoholic beverages when the nightclub opened on January 28, 1994. As a gesture of good will, she gave drinks away to the persons who attended the opening.

Ms. Dalton consulted a lawyer soon after Mr. Sender's accusations that she intended to operate a gay bar. On April 6, 1994, a lawyer representing Concrete Spaces and Faux Fur informed the lessors' lawyer that the lessors had breached the lease by delaying the construction and by failing to obtain a use and occupancy permit from the fire marshal. Accordingly, the lessees' lawyer stated that it was no

longer feasible for the lessees to continue to wait to open their business and that the lessees would vacate the premises on April 11, 1994.

On April 7, 1994, the Daltons and their two corporations filed suit in the Chancery Court for Davidson County against Mr. Sender, National Building Corporation, and the partnership that owned Cummins Station. The complaint included claims for breach of contract, negligent misrepresentation, fraudulent misrepresentation, and violation of the Tennessee Consumer Protection Act and sought recovery of compensatory damages, punitive damages, and treble damages. The essence of the Daltons' claim was that Mr. Sender and his business associates had deceived them about the quality and availability of the space in Cummins Station and that Mr. Sender had "intentionally carried on a systematic plan of harassment and lack of cooperation" to force them to abandon their leases in order to enable him to lease the space to others on more favorable terms. The lessors filed a counterclaim seeking damages for the lessees' alleged breach of the leases. Following a nine-day trial, the jury awarded the Daltons $75,000 in compensatory damages and $1,100,000 in punitive damages. The trial court denied the post-trial motions but reduced the punitive damage award to $500,000 – the amount of punitive damages prayed for in the complaint.

## II.

The lessors mount a three-pronged attack on the punitive damage award. First, they assert that the trial court should not have permitted the jury to award punitive damages because of its previous finding that the lessors had violated the Tennessee Consumer Protection Act. Second, they insist that the trial court failed to explain its reasons for approving the punitive damage award before entering the judgment. Third, they assert that the punitive damage award was excessive. Since the first issue is dispositive of the punitive damage question, we pretermit the latter two issues

## A.

The trial court, the parties, and the jury struggled with the lessees' multiple claims for relief when the case was submitted to the jury. In its original charge, the trial court set out the legal principles applicable to the lessees' breach of contract, fraudulent misrepresentation, negligent misrepresentation, and punitive damage

claims but omitted an instruction concerning the Tennessee Consumer Protection Act despite the lessees' earlier request for one. Thereafter, the trial court provided the jury with a verdict form containing the following five questions:

> We, the jury, in the cause of *Concrete Spaces, Inc., et al. v. Henry Sender, et al.* find as follows:
>
> 1. We find for the plaintiff against the defendant and fix the compensatory damages at _____.
>
> OR
>
> 2. We find for the defendant against the plaintiff and fix the compensatory damages at _____.
>
> 3. We find that there was no meeting of the minds and, therefore, no contract.
>
> YES_____          OR          NO_____
>
> 4. If compensatory damages for the plaintiff were fixed above by the jury, then the jury will answer this question. Are the plaintiffs due punitive damages *under the Tennessee Consumer Act* [sic]? (emphasis added).
>
> YES_____          OR          NO_____
>
> 5. If you find that the plaintiffs are entitled to compensatory damages, do such damages arise from an unfair and deceptive act or practice by the defendants?
>
> YES_____          OR          NO_____

During a recess before the jury retired to deliberate, the trial court acknowledged errors in questions four and five. When the jury returned, the trial court read the corrected verdict form that included revised questions four and five which now read:

> 4. If compensatory damages for the plaintiff were fixed above by the jury, then the jury will answer this question. Are the plaintiffs due punitive damages.
>
> YES_____          OR          NO_____
>
> 5. If you find that the plaintiffs are entitled to compensatory damages, did such damages arise from an unfair or deceptive act or practice by the defendants under the Tennessee Consumer Act [sic]?
>
> YES_____          OR          NO_____

After deliberating approximately ninety minutes, the jury sent word that it wanted a copy of the Tennessee Consumer Protection Act. After the parties could not agree on the substance of a supplemental instruction, the trial court brought the jury back into court and informed them that it would not be "proper" to give them a copy of the Act because it was "rather lengthy." Instead, the trial court provided the jury with a brief description of the Act's purpose but did not provide a definition of an "unfair or deceptive act or practice." The trial court recessed for the day after the jury

asked additional questions concerning the propriety of quotient verdicts[4] and the calculation of the parties' attorney's fees. When the foreperson announced that the jury had already answered one of the questions on the verdict form, the trial court stated that it would retain the form until the following day. In the jury's absence, the trial court candidly informed the parties that it should not have given the jury a portion of the instructions concerning the Tennessee Consumer Protection Act.

When court convened the next morning, the trial court provided the jury with a new verdict form in addition to the one they had already started to fill out. The trial court also provided additional instructions concerning attorney's fees[5] and the meaning of unfair and deceptive acts or practices.[6] After deliberating for approximately ninety minutes, the jury announced its verdict. Reading from the jury form, the foreperson stated in answer to question one that

> 1. We find for the plaintiff against the defendant and fix the compensatory damages at <u>$75,000 plus accrued attorneys fees through case closure</u>.

In answer to the third question, the jury responded that the parties had entered into a contract. In answer to the fourth question, the jury responded that the lessees were entitled to punitive damages. Finally, in response to the fifth question, the jury answered that the lessees' compensatory damages arose "from an unfair or deceptive act or practice by the defendants under the Tennessee Consumer Act [sic]."

During a recess before the punitive damage phase of the trial, both lawyers expressed concern over the jury's vague finding with regard to attorney's fees. Eventually, the lawyers and the trial court decided that the jury must have intended to award the lessees $101,000 ($75,000 in compensatory damages plus $26,000 in attorney's fees paid by the lessees prior to the trial). However, when the jury was informed that the parties had agreed to amend their verdict to $101,000, the

---

[4]Quotient verdicts are, of course, improper. *See Odom v. Gray*, 508 S.W.2d 526, 532 (Tenn. 1974); *Thompson v. State*, 197 Tenn. 112, 116, 270 S.W.2d 379, 381 (1954). Accordingly, the trial court informed the jury that it could not render such a verdict.

[5]The trial court simply informed the jury that "The attorneys have presented the evidence to you with respect to the attorneys fees and I think that answers your question."

[6]The trial court informed the jury that the General Assembly had "included 29 examples of unfair and deceptive acts or practices" in the statute and that the members of the jury "should apply the usual and ordinary meaning to the words unfair and deceptive acts."

foreperson stated that the jury had intended to include the $26,000 in attorney's fees that the lessees had already paid in its $75,000 award.

With all participants in agreement with the $75,000 compensatory damage award, the punitive damage phase of the trial proceeded. The jury deliberated for less than one hour and adjourned. After deliberating briefly the following morning, the jury awarded the lessees $1,100,000 in punitive damages. In response to the lessors' post-trial motions, the trial court reduced the punitive damage award to $500,000 – the amount prayed for in the complaint[7] – and then approved the reduced punitive damage award because of Mr. Sender's "highly insulting" treatment of Ms. Dalton and because of the "numerous unfair and deceptive acts" committed by the lessors.

## B.

We must, whenever possible, give effect to, rather than undermine, a jury's verdict. *See Bankhead v. Hall*, 34 Tenn. App. 412, 424, 238 S.W.2d 522, 527 (1950). Thus, we must give verdicts their most favorable interpretation and must give effect to the jury's intent if permissible under law, *see Briscoe v. Allison*, 200 Tenn. 115, 125-26, 290 S.W.2d 864, 868 (1956); *Newsom v. Markus*, 588 S.W.2d 883, 886 (Tenn. Ct. App. 1979). We must also give effect to verdicts, even if they are defective in form, if they enable the trial court to intelligently pass judgment on them. *See Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 27 (Tenn. Ct. App. 1993).

An inconsistent verdict, however, resolves no conflicts and is no verdict at all. *See McInturff v. White*, 565 S.W.2d 478, 481 (Tenn. 1976). It is a nullity. *See Slaten v. Earl Campbell Clinic Hosp.*, 565 S.W.2d 483, 484 (Tenn. 1978); *Milliken v. Smith*, 218 Tenn. 665, 668, 405 S.W.2d 475, 477 (1966). Thus, we cannot give effect to a jury's verdict based on irreconcilably inconsistent answers to special interrogatories. *See Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1259 (Colo. 1994); *Carr v. Strode*, 904 P.2d 489, 503 (Haw. 1995); *Shamrock, Inc. v. FDIC*, 679 N.E.2d 344, 349 (Mass. Ct. App. 1994).

---

[7]The lessees made an oral motion at trial to increase their compensatory and treble damages claims but did not move to increase their punitive damage claim.

Inconsistent verdicts are frequently caused by inadequate or confusing instructions. Jurors must receive and act on the law as presented to them by the trial court, *see McCorry v. King's Heirs*, 22 Tenn. (3 Hum.) 266, 277 (1842), and the trial court's instructions are the sole source of the legal principles used by jurors to guide their deliberations. *See State ex rel. Myers v. Brown*, 209 Tenn. 141, 148-49, 351 S.W.2d 385, 388 (1961). Thus, trial courts must provide jurors with accurate instructions that fairly embody the parties' theories that are supported by the pleadings and the proof. *See Betty v. Metropolitan Gov't*, 835 S.W.2d 1, 10 (Tenn. Ct. App. 1992).

In addition to the trial court's instructions, a special verdict form also provides the jurors with guidance concerning how to apply the legal principles in the instructions to the evidence they have heard. Decisions regarding the use of special verdict forms and the substance of these questions on the forms rest within the trial court's discretion. *See* Tenn. R. Civ. P. 49.02; *Smith v. Parker*, 213 Tenn. 147, 159-60, 373 S.W.2d 205, 211 (1963); *Petty v. Estate of Nichols*, 569 S.W.2d 840, 847 (Tenn. Ct. App. 1977). However, a special verdict form should include all issues raised by the parties. *See Life & Cas. Ins. Co. v. Robertson*, 6 Tenn. App. 43, 55 (1927).

Special verdict forms should use the same terms as those used in the jury instructions. *See Lundquist v. Nickels*, 605 N.E.2d 1373, 1389 (Ill. Ct. App. 1992). They should repeat and highlight the salient issues discussed in the instructions. *See Kass v. Great Coastal Express, Inc.*, 676 A.2d 1099, 1107 (N.J. Super. 1996). Inconsistencies in the jury instructions and the special verdict form may confuse the jury. *See Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 103 (Tenn. Ct. App. 1996). Thus, the instructions and special verdict form should be construed together to determine whether they present the contested issues to the jury in an unclouded, fair manner. *See Morton v. City of Chicago*, 676 N.E.2d 985, 990 (Ill. Ct. App. 1997); *Capers v. The Bon Marche*, 955 P.2d 822, 825 (Wash. Ct. App. 1998); *Nischke v. Farmers & Merchants Bank & Trust*, 522 N.W.2d 542, 549 (Wis. Ct. App. 1994). Reversal is required when the special verdict form is confusing and does not comport with the jury instructions. *See Helmar v. Harsche*, 686 A.2d 766, 775 (N.J. Super. 1996).

When viewed together, the instructions and special verdict forms used in this case could only have confused the jurors about the relationship between Tennessee Consumer Protection Act claims and punitive damages. The original special verdict form actually stated that the lessees could receive punitive damages for Tennessee Consumer Protection Act claims. Even though the jurors later received a second special verdict form correcting this error, the trial court never explained to them why they were receiving a revised special verdict form and even permitted the jurors to retain the erroneous form during their deliberations. Even as revised, the special verdict form did not foreclose the possibility that punitive damages were available in Tennessee Consumer Protection Acts cases, and this ambiguity in the special verdict was compounded by the extremely broad, generalized instructions concerning Tennessee Consumer Protection Act claims eventually given by the trial court.

The jury's confusion is reflected in their answers on the special verdict form. Their conclusions that the lessees are entitled to punitive damages and that the lessors' breach of their lease obligations violated the Tennessee Consumer Protection Act are inconsistent. Punitive damages are generally not available in breach of contract cases, *see Bland v. Smith*, 197 Tenn. 683, 687, 277 S.W.2d 377, 379 (1955); *B.F. Myers & Son of Goodlettsville, Inc. v. Evans*, 612 S.W.2d 912, 916 (Tenn. Ct. App. 1980),[8] and cannot be awarded with regard to Tennessee Consumer Protection Act claims. *See Lorentz v. Deardan*, 834 S.W.2d 316, 320 (Tenn. Ct. App. 1992); *Paty v. Herb Adcox Chevrolet Co.*, 756 S.W.2d 697, 699 (Tenn. Ct. App. 1988). In the place of punitive damages, Tenn. Code Ann. § 47-18-109(a)(3) (1995) authorizes trial courts to award treble damages when there has been a "willful or knowing" violation of the Tennessee Consumer Protection Act. *See Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 12 (Tenn. Ct. App. 1992).

The problem created by the jury's misunderstanding about punitive damages does not necessarily vitiate the entire verdict. Verdicts have a liability component and a damage component. *See All v. John Gerber Co.*, 36 Tenn. App. 134, 138, 252 S.W.2d 138, 139 (1952). The instructions and special verdict form presented the liability and compensatory damage issues to the jury fairly and understandably but

---

[8]Punitive damages may be awarded in rare cases where the breach of contract is coupled with a tort involving fraud, malice, gross negligence, or oppression. *See Medley v. A.W. Chesterton Co.*, 912 S.W.2d 748, 753 (Tenn. Ct. App. 1995).

fell short only with regard to the enhanced damage issues. Accordingly, we affirm the portion of the verdict and judgment finding that the lessors breached the lease agreements and determining that the lessees sustained $75,000 in compensatory damages as a result of these breaches. However, we vacate the punitive damage award and remand the case to enable the trial court to determine whether the lessees' compensatory damages should be trebled according to the standards contained in Tenn. Code Ann. § 47-18-109(a)(3)&(4).[9]

## C.

Tenn. R. Civ. P. 8.01 permits plaintiffs to plead in the alternative. Accordingly, it is now common for plaintiffs to include Tennessee Consumer Protection Act claims in the same complaint with common-law claims for fraud, promissory fraud, or fraudulent or negligent misrepresentation. It is also common for plaintiffs to request punitive damages and treble damages in the same complaint.[10] Because plaintiffs are not entitled to both punitive damages and treble damages, *see Lorentz v. Deardan*, 834 S.W.2d at 320, trial courts and the parties should take care to make sure that the issues involving the exemplary damages be presented to the jury clearly and fairly.

We offer the following suggestions for avoiding the confusion that beset the jury in this case. The jury instructions should fairly set out the elements of each of the plaintiff's common-law and statutory causes of action. A trial court may permit the jury to return a general verdict, but if the plaintiff is seeking both punitive and treble damages, the trial court must require the jury to answer two questions. If the jury awards the plaintiff compensatory damages, it must also decide (1) whether the

---

[9]No issue was raised on this appeal concerning whether the Tennessee Consumer Protection Act applies to commercial transactions such as the one involved in this case. Thus, our opinion provides no precedent for extending the Tennessee Consumer Protection Act to commercial leases.

[10]See generally Lisa K. Gregory, Annotation, *Plaintiff's Rights to Punitive or Multiple Damages When Cause of Action Renders Both Available*, 2 A.L.R. 5th 449 (1992).

acts giving rise to the compensatory damages were knowing and willful[11] and (2) whether the defendant acted intentionally, fraudulently, maliciously, or recklessly.[12]

If the jury answers "no" to both questions, then the plaintiff is not entitled to exemplary damages under any theory. If the jury answers "yes" to the first question and "no" to the second, the trial court must proceed on its own to determine whether the compensatory damages should be trebled in accordance with the Tennessee Consumer Protection Act. If the jury answers "yes" to the second question and "no" to the first, the jury must determine whether the plaintiff should recover punitive damages in accordance with the procedures mandated by the *Hodges v. S.C. Toof & Co.* decision.

Conceivably, the jury could answer "yes" to both questions. If a jury does so, the trial court should, at that juncture, invoke the doctrine of election of remedies whose purpose is to prevent the possibility of double recovery of damages. *See Wimley v. Rudolph*, 931 S.W.2d 513, 515 (Tenn. 1996); *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 822 (Tenn. Ct. App. 1995). In order to prevent a double recovery of exemplary damages, the trial court should require the plaintiff to decide whether it will pursue punitive damages in accordance with the *Hodges v. S. C. Toof & Co.* decision or whether it will pursue treble damages in accordance with Tenn. Code Ann. § 47-18-109(a)(3)&(4).

In lieu of a general verdict, the trial court may also decide to submit special interrogatories to the jury in accordance with Tenn. R. Civ. P. 49. In that circumstance, the trial court's instructions must fairly set out the elements of each of the plaintiff's common-law and statutory causes of action. The special interrogatories must be consistent with the instructions and must cover each of the plaintiff's common-law and statutory claims. If the jury determines that the plaintiff is entitled

_____

[11]This question relates to the plaintiff's claim for treble damages under the Tennessee Consumer Protection Act.

[12]This question relates to the plaintiff's claim for punitive damages and is required by *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 900-901 (Tenn. 1992) in order to determine whether the jury will proceed to consider the plaintiff's punitive damage claim.

to compensatory damages, it should state the amount of the damages and should also identify each of the causes of action for which the plaintiff has carried its burden of proof. The jury should also be asked (1) whether the acts giving rise to the compensatory damages were knowing and willful or (2) whether the defendant acted intentionally, fraudulently, maliciously, or recklessly.

If the jury answers "no" to both of these questions, then the plaintiff is not entitled to exemplary damages under any theory. If the jury answers "yes" to the former and "no" to the latter, then the trial court should proceed to consider whether the compensatory damages should be trebled under the Tennessee Consumer Protection Act if, and only if, the jury has also determined that the defendant has violated the Tennessee Consumer Protection Act but not any of the other common-law claims. If the jury answers "no" to the former question and "yes" to the latter, the trial court should proceed with the hearing on punitive damages if, and only if, the jury has determined that the plaintiff has carried its burden of proof on any of its common-law claims warranting punitive damages, but not on its claim under the Tennessee Consumer Protection Act. If the jury answers "yes" to both questions and has determined that the plaintiff has carried its burden of proof with regard to its Tennessee Consumer Protection Act claim and at least one of its common-law claims, then the trial court should require the plaintiff to decide to pursue either punitive damages or treble damages under the Tennessee Consumer Protection Act.

### III.

As a final matter, the lessors argue that discrepancies in the designation of the parties in the special verdict forms and the judgment require that the judgment be overturned. Relying on *Whittemore v. Classen*, 808 S.W.2d 447, 458 (Tenn. Ct. App. 1991), they assert that the verdict is too uncertain to permit the entry of a judgment and that the judgment does not conform to the verdict. While the discrepancies in the special verdict form and the judgment are unfortunate, we find that they did not prevent the trial court from intelligently rendering a judgment in the case consistent with the jury's verdict.

### A.

The complaint named four plaintiffs and three defendants and alleged that each group had strong business connections. The plaintiffs included Ms. Dalton, her husband, and the two corporations she formed to operate her gallery, boutique, and nightclub. The defendants included Mr. Sender, the partnership consisting of Mr. Sender and others formed to develop and lease Cummins Station, and National Building Corporation, Mr. Sender's construction company run by his son-in-law that was serving as the construction manager for the Cummins Station project.

From the outset of the litigation, all parties recognized the strong unity of interest among the parties plaintiff on one hand and the parties defendant on the other. Virtually all the claims for relief in the complaint referred to the "plaintiffs" collectively and to the "defendants" collectively. Likewise, the answer and counterclaim were filed on behalf of the "defendants" collectively, and the factual averments in both the answer and the counterclaim referred collectively to the "plaintiffs" and the "defendants." The pleadings contain no indication that any single plaintiff or defendant took a position inconsistent with its counterparts or that any defendant undertook to pass liability on to one of the other defendants.

The parties maintained their unity of interest throughout the discovery process, the pretrial proceedings, and the trial. Neither party presented evidence that the plaintiffs or the defendants were not acting in concert. Ms. Dalton was the plaintiffs' central witness, and Mr. Sender was the only defendant participating in the trial. The evidence makes clear that Mr. Sender was not just representing himself but was also representing the interests of the partnership[13] and National Building Corporation.[14]

The lessors' proposed instructions and proposed special verdict form also referred to the "plaintiffs" and the "defendants" collectively. In addition, the opening and closing statements of the lawyers for both parties contained repeated references

---

[13]As a matter of law, the acts of partners taken in the course of partnership business are binding on the partnership. *See Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 444, 232 S.W. 961, 972 (1921); *Wyatt v. Brown*, 39 Tenn. App. 28, 35, 281 S.W.2d 64, 68 (1955).

[14]Mr. Sender was the president and principal stockholder of National Building Corporation. Corporations act at the direction of their officers and through their officers and employees. *See Nelson v. Martin*, 958 S.W.2d 643, 650 (Tenn. 1997); *Allied Sound, Inc. v. Neely*, 909 S.W.2d at 821. The record contains no evidence that Mr. Sender was not acting on behalf of both the construction company and the partnership in his dealings with Ms. Dalton.

to the "plaintiffs" and the "defendants." The trial court's instructions were likewise couched in terms of "plaintiffs" and "defendants." Inexplicably, both versions of the special verdict form prepared by the trial court did not contain consistent, complementary references to the remedies. In two of the four questions referring to the parties, the parties are referred to in the singular rather than the plural.[15] One question contained party designations in both singular and plural form,[16] and one question referred to both groups of parties in the plural.[17]

Neither party took issue with the plural or singular designations of the parties plaintiff or the parties defendant or with the special verdict form. When the jury announced its verdict regarding compensatory damages, neither party requested clarifications with regard to whom or against whom the damages had been awarded. Likewise, neither party took issue with the special interrogatory on punitive damages,[18] and when the jury announced that it had awarded the "plaintiffs" $1,100,000 in punitive damages, neither party requested clarification concerning against whom or in whose favor these damages had been awarded.

Thereafter, the trial court entered a judgment prepared by the lessees' lawyer that recited the jury's answers on the two special verdict forms and that ordered "that the *plaintiffs* have and recover of the *defendants* judgment in the amount of Seventy-Five Thousand Dollars ($75,000.00) compensatory damages and One Million One Hundred Thousand Dollars ($1,100,000.00) punitive damages." (emphasis added). Notwithstanding the use of the preceding plural designations of the "plaintiffs" and the "defendants," the judgment concluded by taxing the costs against the "defendant."

_____

[15]These questions include the first and second questions on the special verdict form which state "[w]e find for the *plaintiff* against the *defendant* and fix compensatory damages at ____" (emphasis added) and that "[w]e find for the *defendant* against the *plaintiff* and fix the compensatory damages at ____" (emphasis added).

[16]The fourth question on the special verdict form stated: "If compensatory damages for the *plaintiff* were found above by the jury, then the jury will answer the question. Are the *plaintiffs* due punitive damages?" (emphasis added).

[17]The fifth question on the special verdict form asked: "If you find that the *plaintiffs* are entitled to compensatory damages, did such damages arise from an unfair or deceptive act or practice by the *defendants* under the Tennessee Consumer Act [sic]?" (emphasis added).

[18]The question regarding punitive damages read, in part, as follows: "You, the jury, have found that the *plaintiffs* are entitled to punitive damages. It is now your duty to fix the amount of damages." (emphasis added).

The lessors raised the issue of the discrepancies caused by the use of the singular and plural references in the two verdict forms and the judgment for the first time in their motion for new trial. After noting that the case had been tried on the basis that there was a unity of interest between the parties plaintiff and the parties defendant, the trial court declined to grant a new trial because the lessors had not raised the issue at the stage of the proceeding where the ambiguity could easily have been clarified and corrected if need be.

## B.

We have determined that the lessors have waived their opportunity to take issue with the designations of the parties. Like the lessees, the lessors tried this case on the basis that there was a unity of interest among the parties plaintiff and a similar unity of interest among the parties defendant. Unlike the other ambiguity in the jury's compensatory damage verdict that was raised and corrected while the jury was still empaneled, the lessors did not call the trial court's attention to the discrepancies in the parties' designations while the jury could still have corrected them. Lawyers have an obligation to assist the trial court at all stages of litigation and cannot seek relief on appeal from errors that were, in part, of their own making. *See* Tenn. R. App. P. 36(a); *Henry County Bd. of Educ. v. Burton*, 538 S.W.2d 394, 397 (Tenn. 1976); *Gilson v. Gillia*, 45 Tenn. App. 193, 217, 321 S.W.2d 855, 866 (1958).

The lessors insist, however, that the ambiguous designation of the parties on the verdict forms are so fundamentally prejudicial that they should be excused from their obligation to alert the trial court in a timely manner so that they can be corrected. While we do not make light of the obvious shortcomings of the special verdict forms used in this case, we have concluded that the lessors overstate the prejudicial significance of the problem.

A trial court may enter a judgment on a jury verdict, even when the verdict's form is defective, as long as the verdict permits the trial court to intelligently pass judgment according to the jury's decision. *See Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d at 27; *Tennessee Cent. Ry. v. Scarbrough*, 9 Tenn. App. 295, 299 (1928). However, the lessors insist that the trial court could not intelligently pass judgment on the verdict because the answers to the special interrogatories were too

-18-

uncertain to enable the trial court to determine against whom the damages were awarded. *See Whittemore v. Classen*, 808 S.W.2d at 458-59. We disagree under the facts of this case.

When a verdict or judgment is awarded against multiple parties designated as "defendants" rather than by name, the courts may look to the process, pleadings, and proceedings to ascertain the parties against whom the jury has rendered the verdict. *See Wilson v. Nance*, 30 Tenn. (11 Hum.) 189, 191-92 (1850). Despite the sloppy drafting of the special interrogatories, the pleadings and the overwhelming weight of the evidence permitted the trial court to conclude that the jury intended to return a verdict in favor of all plaintiffs against all defendants. Accordingly, the trial court could properly enter judgment for all plaintiffs against all defendants.

## IV.

We affirm the portion of the judgment awarding all plaintiffs $75,000 in compensatory damages against all defendants, and we reverse the $500,000 judgment for punitive damages against all defendants. We remand the case to enable the trial court to determine whether the plaintiffs' compensatory damages should be trebled under the standards contained in Tenn. Code Ann. § 47-18-109(a)(3)&(4) and for any other proceedings that may be necessary. We tax the costs of this appeal in equal proportions to Paulette and Stuart Dalton, jointly and severally, and to Henry Sender and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION

_____
BEN H. CANTRELL, JUDGE